MAUNEY *v.* MILLAR, TRUSTEE.

Opinion delivered April 22, 1918.

1. RES ADJUDICATA—FRAUD—BREACH OF CONTRACT.—A contract was made between one M. and appellee, whereby the latter agreed to work certain land as a diamond mine in a certain manner. Actions were brought by M. and later by his widow to cancel the lease agreement upon the grounds of fraud, and that the defendant had broken the terms of the contract, and decree was entered dismissing such actions. *Held,* that in a subsequent action by the widow of M. the issue of fraud would be treated as *res adjudicata,* and also the question of breach up to the time of the adjudication of the former suits.

2. CONTRACTS — ABANDONMENT — REMEDY — OPERATION OF MINE.— Where the sole benefit of a contract results from a continued performance of the contract (such as to develop a mine, to operate it, pay royalties or to divide the proceeds), where one party completely abandons the performance thereof, equity will give relief by canceling the contract. For a partial breach the parties will be remitted to their remedies at law, but for abandonment equity affords relief by rescission or cancellation.

Appeal from Pike Chancery Court; *Jas. D. Shaver,* Chancellor; affirmed.

*W. C. Rodgers,* for appellants.

1. The plea of *res judicata* was not sustained. 117 Ark. 633; 22 *Id.* 572; 39 *Id.* 442; 40 *Id.* 545; 92 *Id.* 460; 106 *Id.* 310; 92 *Id.* 460.

2. The terms of the lease were violated by appellees and they are liable. 102 Ark. 433; 50 *Id.* 562; 93 *Id.* 269; 113 *Id.* 471-8; 110 *Id.* 335; *Ib.* 402, etc.

3. The lease should be canceled and appellants are entitled to the relief prayed. The chancellor erred in denying relief. 110 Ark. 335, 402, etc.; 113 *Id.* 478; 112 N. C. 677; 64 Ark. 240; 97 *Id.* 167; 114 *Id.* 419; 126 *Id.* 46; 104 *Id.* 19, 129; 109 *Id.* 465; 121 *Id.* 4; 101 *Id.* 573; 75 *Id.* 288; 105 *Id.* 592; 114 *Id.* 421; 22 *Id.* 258; 78 *Id.* 341; 38 *Id.* 178; 65 *Id.* 320; 99 *Id.* 197; 105 *Id.* 171; 3 Mon. 327; 3 B. Mon. 2. See also 56 N. Y. Supp. 770; 16 Ky. L. Rep. 158; 107 Va. 25; 133 U. S. 156; 64 N. Y. Supp. 153; 2 Bl. Com. 135; 2 Snyder on Mines, § 1226-7; 114 Ark. 419, 421; 112 N. C. 677. The conduct of appellees is a studied purpose to stifle the mine and industry and deprive appellants of any benefits from diligent develop- ment in good faith. Equity does not minister to inequity nor aid injustice. It should give adequate relief. 125 Ark. 34; 116 *Id.* 393.

*Thos. C. McRae, W. V. Tompkins, D. L. McRae* and *C. H. Tompkins,* for appellees.

1. The lease is binding and appellants have accepted benefits. There is no forfeiture clause in it and it has not been abandoned. 100 Ark. 568; 77 *Id.* 305; 41 *Id.* 532; 24 Cyc. 1349. Forfeitures are not favored. 59 Ark. 409; 78 *Id.* 202; 77 *Id.* 168; 98 *Id.* 168; 102 *Id.* 442.

2. The evidence does not sustain a breach or forfeiture of the lease. 1 Pom. Eq., § 459.

3. All alleged forfeitures are waived. The matters are now *res adjudicata.* 100 Ark. 565; 101 *Id.* 461; 57 Pa. St. 65. The decree is right.

McCULLOCH, C. J. M. M. Mauney owned forty acres of land in Pike County, Arkansas, which contained a deposit of Kimberlite or diamond-bearing dirt, and sold thirty acres of it to parties who organized a corporation known as the Ozark Mining Company for the purpose of developing it. On April 3, 1912, Mauney entered into a contract with Howard A. Millar whereby he leased the remaining ten acres to Millar for a period of fifty years for the purpose of having the same de-

veloped and operated as a diamond mine. The ten acres covered by the lease was known as the "Mauney Diamond Mine." The written contract recited that Mauney desired to have the property developed and worked and that Millar was a practical mining engineer, with considerable experience in testing out deposits of Kimberlite, and was associated with business men of large means who would become interested in developing the mine. The undertaking was, on the part of the lessee, that he and his associates and assigns would "diligently and faithfully prosecute the work of development of said property as outlined herein in a scientific and practical manner and to begin operation within thirty days from April 10, 1912, by taking such preliminary steps towards the preparation of plans and purchase of machinery necessary to carry on the work in contemplation and to erect and install a modern washing and concentrating plant of African type within one year from April 10, 1912, and as much earlier as can reasonably be done and in good faith and with diligence to begin washing for diamonds within one year from said 10th day of April, 1912, and as much earlier as can reasonably be done, and to treat and wash for the recovery and extraction of diamonds and other precious stones a minimum of 10,000 loads of material from the first described tract of land known as the Mauney Diamond Mine "Property," during each and every year of this lease, and as much more as can reasonably be done."

The last clause of the contract reads as follows:

"The lessees shall in no event cease work for a longer period than three months continuously unless a necessity therefor should arise by the act of God, or from contingencies beyond the control of the lessees or from physical or other conditions which are not the fault of the lessees and which could not reasonably be guarded against, but this clause of this lease shall not operate or be construed to release the lessees from washing and treating for diamonds as much as 10,000 loads of dirt

every year, and as much more as can reasonably be done.''

The contract further provided that the lessor should receive, as his share, one-fourth of the diamonds and other precious stones and minerals taken from the leased land, and that the lessee should receive the other three-fourths, and that the output should be reported every three months and divided according to the terms of the contract. It also provided that the lessee should fix the price of the diamonds extracted from the mines and that the lessor should have the privilege of taking over the whole of the output at that price or that the lessor might fix the price and the lessee have the privilege of taking over at that price, and the amount divided.

The lessee and his associates subsequently organized a corporation known as the Kimberlite Diamond Mining & Washing Company, and assigned the lease contract to that concern. Still later the lease was assigned by the corporation above named to the original lessee, Howard A. Millar, and Austin Q. Millar and W. V. Wilder as trustees. The lessee and his assigns proceeded with preparation to develop the mine and expended approximately $100,000 in constructing the washing plant, tramroads and other equipments for operating the mine. The attempt of the Ozark Mining Company to develop the other land into a diamond mine proved a financial failure and the company went into bankruptcy. The lessee under the contract with Mauney purchased the Ozark property and carried on development operations in connection with the development of the Mauney mine. No improvements were constructed, however, on the Ozark property, but dirt from that property was carried to the washing plant which was constructed for the development of the Mauney mine. On April 11, 1913, Mauney instituted an action against the Kimberlite Diamond Mining & Washing Company as the holder of the lease contract to cancel the lease on the ground of fraud in procurement by the lessee, it being alleged that the lease

was not entered into in good faith for the purpose of carrying it out, but that it was entered into with the fraudulent purpose of depreciating the value of the property so that the title in fee could be acquired and that the lessee had failed to comply with the contract. That case was instituted in the chancery court of Pike County, but was removed to the Federal court and upon final hearing a decree was rendered dismissing the complaint for want of equity. In April, 1914, Mauney instituted a second action against the lessee to recover possession of a lot of diamonds which had been mined from the land, and in the complaint alleged that the lease had been entered into by the lessee with the fraudulent intention of not complying with it, and that it was void from the beginning. That case was tried before a jury, and upon special interrogatories submitted, which the jury answered, there was a finding that the lessee had not entered into the contract with a fraudulent purpose and had not failed to comply with the terms of the lease. Judgment was entered in favor of the lessee, and that judgment was, on appeal, affirmed by this court. 117 Ark. 633.

M. M. Mauney died in the year 1915, and his wife, Bettie L. Mauney, who had joined in the lease contract, became the administratrix of the estate, and on May 11, 1915, she entered into a contract with the lessee for a division of the stock of diamonds then on hand. The contract provided for an assortment and classification of the diamonds and a division thereof according to the terms of the original contract. That contract was fully complied with and the administratrix received her intestate's share of the stock of diamonds and gave a written receipt therefor.

The present action was instituted by the administratrix and the children of M. M. Mauney in August, 1916, against the three trustees holding the lease contract as assignees. It was first brought as an action at law to recover possession of diamonds which had been taken out of the mine since the former settlement and di-

vision, but the complaint contained the same allegations as the complaints in the former actions concerning fraud in the procurement of the contract and the failure of the lessee and his assignees to perform the contract in good faith. It was alleged that the defendants had quit working on the Mauney mine and were devoting all of their equipment to the development of the Ozark property, which was adjoining, and had failed to proceed in good faith with the development of the Mauney mine and had failed to take out and treat as much as 10,000 loads of dirt, and as much more as could reasonably be done, as stated in the contract. There were other allegations in the complaint with respect to the failure of the defendants to permit plaintiffs to have access to the mine. There was an answer and cross-complaint filed, and by consent the case was transferred to equity and heard there as a suit to cancel the lease. The chancellor, upon the hearing of the case, denied the relief prayed for and dismissed the complaint for want of equity.

(1) The proof adduced by the plaintiffs was given wide range, extending back to the negotiations between the parties at the time of the execution of the original contract, and the effort was to establish the old charge that the contract was not entered into in good faith, but for the purpose of tying up the property by a long term lease so that the lessee could eventually acquire title. The defendants pleaded the decree in the Federal court and also the judgment of the circuit court in the replevin suit in bar of the right to sue to cancel the contract on account of fraud in its procurement, and also in bar of the charge that there had been a failure to comply with the terms of the contract up to the time of those adjudications. It is, clear, we think, that each of those cases constituted an adjudication of the issues concerning fraud in the execution of the contract, and also constituted adjudications that the terms of the contract had not been broken by the defendants up to the time of the institution of those suits. The right of action in this

case, if there is one, extends back no farther than the last of the adjudications thereof and must be tested solely by proof tending to show a breach of the contract since that time.

(2)   After consideration of the testimony we have reached the conclusion that there is not a preponderance against the finding of the chancellor.   The contract contains no express provision for forfeiture of the lease and counsel for defendants invoke the established rule that a tenancy can not be terminated for breach of covenant by the lessee where there is no express provision for a forfeiture, and that a court of equity will not lend its aid to declare a forfeiture on acccount of a breach of the contract.   1 Pomeroy's Equity, sec. 459; *Buckner* v. *Warren,* 41 Ark. 532; *Little Rock Granite Co.* v. *Shall,* 59 Ark. 405; *Williams* v. *Shaver,* 100 Ark. 565.

There is another principle, however, equally well established that where one party to a contract has completely abandoned performance, a court of equity will give relief by canceling the contract, and that principle is applicable to a contract of this kind where the sole benefit is to result from continued performance, such as one to develop a mine to pay royalty or divide the proceeds.   *Mansfield Gas. Co.* v. *Parkhill,* 114 Ark. 419.   For a partial breach of the contract the parties thereto will be remitted to their remedies at law, but in case of an abandonment equity will afford relief by rescission and cancellation.

The contract in the present case clearly contemplated a persistent effort to develop the mine. It provides for a minimum amount of dirt to be taken out and washed, but further provides that the work shall be carried on with diligence and that as much as reasonable should be taken from the mine.   If the proof was sufficient to sustain the charge in the complaint that the defendants were not substantially complying with the contract, relief should be granted, but we do not think that the proof is sufficient to overturn the finding of the chan-

cellor against that contention. It is undisputed that defendants have taken out the minimum quantity of dirt specified in the contract, that is to say 10,000 loads per annum. Millar testified that the year preceding the commencement of this action he took out of the Mauney mine 11,219 loads and from the Ozark property only 819 loads. The testimony adduced by plaintiffs tended to show that about the same quantity of dirt was taken from the Ozark property as from the Mauney mine, but the statements of the witnesses are vague and they do not undertake to specify the quantity of dirt taken. Millar explained the purchase of the Ozark property by his company, stating that there was danger of his company incurring liability for injury to adjoining property from falling embankments or walls after excavation on the mining property, and that he was advised by attorneys that he could buy the Ozark property at a very low price and that there would be economy in buying the property on the grounds stated above to escape liability as aforesaid. He further testified that they had not spent any money on the improvement of the Ozark property, and had only mined dirt sufficient to dig drainways to carry off the flow of water from the Mauney mine. He explained that there was drainage from another property called the Reyburn property which also adjoined the Mauney property, and that the drainage from that property over the Mauney property could only be carried off over the Ozark property, and that in digging the drainways they hauled the dirt thus taken out and washed it. It is undisputed that the defendants and their associates have spent a very large sum of money, approximately $100,000, in developing and starting operations on the Mauney mine.

We do not think that the proof is sufficient at this time to justify a finding that there has been such an abandonment of the operations for a court of equity to grant relief by canceling the contract.

This decision is, of course, without prejudice to the rights of the plaintiffs to bring another action at any time it may appear that there has been an abandonment of the contract, or a substantial failure to carry out its terms.

Decree affirmed.

HART, J., dissents.