## MILLAR *v.* MAUNEY.

### Opinion delivered March 8, 1920.

1. **MINES AND MINERALS—ABANDONMENT OF MINE—EVIDENCE.**—In a suit by the owner of realty to cancel a diamond mining lease, on the ground of abandonment of operations by the lessee, evidence *held* insufficient to show an abandonment.

2. **MINES AND MINERALS—COSTRUCTION OF LEASE.**—A lease of land for the purpose of developing its value as a diamond producing property, providing for cancellation in case of abandonment or cessation of work for three months, and giving lessee a right to adopt the underground system of mining, *held* to authorize lessee to sink a shaft running into the property from a point outside of the leased premises.

Appeal from Pike Chancery Court; *James D. Shaver,* Chancellor; reversed.

*McRae & Tompkins,* for appellants; *Fordyce, Holliday & White* (of St. Louis, Mo.), of counsel.

1. Even according to Mauney's construction of the lease, there was no actual breach. The chancellor found no actual breach. Since the lessors failed to avail themselves of their right to value the diamonds, they can not be heard to complain of lessee's failure to do so.

2. The action of lessees in praying the chancellor for a construction of contract for future operations thereunder is not a breach and affords no grounds of forfeiture. 63 W. Va. 502; 61 S. W. 338; 80 *Id.* 941; 90 Tex. 143; 142 S. W. 967; 100 Ark. 561.

3. Even admitted inability to perform the contract within the time specified does not afford ground for rescission prior to the date fixed for complete performance. 21 Fed. 107; 117 U. S. 49; 29 Fed. 984; 90 Tex.

139; 37 S. W. 598; 16 Q. B. Div. 460; 55 L. J. Q. B. (A. S.) 162; 166 Ala. 295; Benjamin on Sales, par. 424.

4. If there had been a breach of the terms of royalty, it would afford no ground for cancellation of the contract by a court of equity. Equity will not interfere unless it is certain that plaintiff has not a plain, adequate and complete remedy at law. 147 Fed. 931; 100 *Id.* 561; 26 *Id.* 309; 134 *Id.* 15. It is a prerequisite for cancellation of a contract that defendant be placed *in statu quo.* 1 Black on Rescission and Cancellation, § 197; 131 S. W. 1061; 76 Fed. 624; 15 Ark. 286; 25 *Id.* 196; 53 *Id.* 16; 30 L. R. A. 44. Here it is impossible for defendant to be placed *in statu quo.*

5. Equity abhors forfeitures and is reluctant to enforce them even where expressly provided for. 59 Ark. 405; 25 *Id.* 285; 42 *Id.* 330; 129 Pa. 81; 95 Ark. 567; 98 *Id.* 328; 51 Mich. 482; 44 Minn. 312; 97 Ind. 247. This is especially true of leases: 100 Ark. 561; 41 *Id.* 532.

6. War is an accident excusing performance of a time contract and relieves against forfeiture. 25 Ark. 138; 26 *Id.* 240.

7. Plaintiff does not come into equity with clean hands. Nonperformance will be excused where performance is prevented by the conduct of the other party. 7 Ark. 123; 102 *Id.* 152; 85 *Id.* 596; 100 C. C. A. 263; 176 Fed. 701.

8. The supplemental agreement relieves the lessees of any breach for nonperformance. 26 Ark. 240. The intention of the parties must be given effect to. 13 C. J. 521; 2 Page on Contracts, § 1104; 24 Ark. 415; 106 *Id.* 400; 107 La. 445.

9. The lessees are entitled to the affirmative relief prayed in the cross-bill. Where equity takes jurisdiction for one purpose, it should retain to adjudicate all the rights of the parties. 92 Ark. 15; 99 *Id.* 438; 105 *Id.* 558; 48 *Id.* 286; 75 *Id.* 52; 111 *Id.* 329; 77 *Id.* 510; 113 *Id.* 100. The court will place itself in the position of the parties who made the contract and carry out the

objects sought to be accomplished. 2 Page on Cont., p. 1745, § 1123; 143 U. S. 596; 95 *Id*. 23; 115 Ala. 258; 61 Mich. 327; 155 Mo. 643; 61 Neb. 861; 68 N. H. 216; 23 Fla. 368; 133 Ill. 234; 108 Fed. 171; 54 L. R. A. 247. The lease should be construed so that the shaft may be started off the leased property if necessary. 18 R. C. L. 1191; 17 Eng. Rul. Cas. 766. The whole case should be construed so as to allow the successful completion of the project to the financal gain of all the parties. 2 Page on Cont., p. 174, § 1121; 127 Fed. 418; 126 Mo. 104.

10. Wilder was a necessary party. 39 Ark. 182-188; 4 Crawf. Dig., p. 3891, § 22.

*W. C. Rodgers,* for appellee.

1. Not having claimed that the lease should be so construed so that the shaft could be started off the leased property if necessary, appellants can not ask the court to change the contract they executed and make another for them. 79 Ark. 460; 61 *Id*. 315; 82 *Id*. 11; 76 *Id*. 582; 108 *Id*. 536; 122 *Id*. 542; 134 *Id*. 413; 90 *Id*. 93; 124 *Id*. 313; 102 *Id*. 580; 83 *Id*. 314; 72 *Id*. 490. The law of this case is settled on former appeal. 134 Ark. 15. Antecedent propositions, correspondence, writings, etc., are all merged into the written contract. 104 Ark. 488; 102 *Id*. 333; 129 *Id*. 358; 112 *Id*. 5; 108 *Id*. 507.

2. This case was tried *de novo* by the chancellor and he is presumed to have disregarded all incompetent testimony. 97 Ark. 136; 99 *Id*. 224. The contract is the foundation of the action and is made part of the complaint. 29 Ark. 447; 33 *Id*. 725; 68 *Id*. 265; 91 *Id*. 403; 99 *Id*. 222; 104 *Id*. 462; 108 *Id*. 364; 132 *Id*. 545; 135 *Id*. 41.

Every material allegation not denied is taken as true. 73 Ark. 224; 91 *Id*. 37. Self-serving declarations are *not* competent testimony. 21 Ark. 356; 23 *Id*. 286; 34 *Id*. 486; 72 *Id*. 412; 123 *Id*. 272; 130 *Id*. 149; 130 *Id*. 326; 90 *Id*. 151; 74 *Id*. 443. The law does not require the doing of a vain or useless thing. 96 Ark. 379; 133

*Id.* 27; 104 *Id.* 129; 109 *Id.* 467; 114 *Id.* 364; 121 *Id.* 264; 136 *Id.* 44.

The objection to Mauney's wife's testimony and that of the husband of Mrs. Kempner, but the objections can not be sustained. 206 S. W. 326; 102 *Id.* 460. The decree is right and should be sustained, even if some of the reasons given are wrong. 49 Ark. 22; 73 *Id.* 422; 75 *Id.* 107; 79 *Id.* 602; 85 *Id.* 4; 12 Utah 104; 52 Miss. 227; 15 Wis. 50; 85 Ark. 129; 102 *Id.* 439; 127 *Id.* 158; 108 *Id.* 283; 123 *Id.* 535; 125 *Id.* 458; 113 *Id.* 384; 132 *Id.* 504.

The decree shows that the findings are sustained by the evidence. The plea of nonjoinder must be made by demurrer, and was not well taken. 48 Ark. 454; 43 *Id.* 230.

McCULLOCH, C. J. This is an action instituted by appellee in the chancery court of Pike County to cancel a lease executed by them to appellants of certain land for the purpose of testing the dirt for diamonds and for developing a diamond mine thereon. The ground set forth in the complaint for the cancellation of the contract is that appellants have ceased operations under the contract and have abandoned it. The action is a renewal of former litigation between the parties with reference to the same subject-matter, viz., the cancellation of the lease. In the last of the former suits between the parties the chancery court denied relief to appellees and on appeal this court affirmed the decree. *Mauney* v. *Millar,* 134 Ark. 15. The facts are set forth in detail in the former opinion and reference thereto is made for rehearsal of the facts contained in the present case. In the opinion we said: ''The right of action in this case, if there is one, extends back no farther than the last of the adjudications thereof and must be tested solely by proof tending to show a breach of the contract since that time. After consideration of the testimony we have reached the conclusion that there is not a preponderance against the finding of the chancellor. The contract contains no express provision for forfeiture of the lease, and counsel for defendants invoke the estab-

lished rule that a tenancy can not be terminated for breach of covenant by the lessee where there is no express provision for a forfeiture, and that a court of equity will not lend its aid to declare a forfeiture on account of a breach of the contract." * * * "There is another principle, however, equally well established that where one party to a contract has completely abandoned performance, a court of equity will give relief by canceling the contract, and that principle is applicable to a contract of this kind where the sole benefit is to result from continued performance, such as one to develop a mine to pay royalty or divide the proceeds."

In addition to the facts set forth in the former opinion, the following clauses of the contract should be set forth in order to completely understand the merits of the present controversy:

"*Seventh.* In the event the lessee, his associates and assigns, become fully convinced that diamonds or other valuable minerals do not exist in the said leased land in commercially paying quantities, and that further operations for this reason would not be warranted, then the said lessee and assigns may, at their option, surrender and cancel this lease without further obligation of lessee, his associates and assigns. And upon such cancellation by the lessee he, his associates and assigns, shall have the right to remove any and all buildings and equipment of whatever nature, placed on or in the properties leased hereunder, at the expense and cost of said lessee, his associates and assigns, within a reasonable time. It is further stipulated and agreed that the said lessee, his associates and assigns, shall pay all taxes lawfully accruing against the land hereby leased from time to time during the life and continuation of this lease, except the taxes for the year 1911."

"*Eighth.* The lessees shall in no event cease work for a longer period than three months continuously, unless a necessity therefor should arise by the act of God, or from contingencies beyond the control of the lessees, or from physical or other conditions which are not the

fault of the lessees, and which could not reasonably be guarded against. But this clause of this lease shall not, operate or be construed to release the lessees from washing and treating for diamonds as much as 10,000 loads of dirt every year, and as much more as can reasonably be done.''

There was a supplemental contract between the parties with reference to the same matter dated May 6, 1912, which was about a month after the execution of the original contract. The supplemental contract was not pertinent to the issues involved in the former case, but it is important to consider the same in the present case. It reads as follows (omitting caption and conclusion):

''As supplemental to the lease contract heretofore executed by M. M. Mauney and wife to Howard A. Millar and associates, it is agreed by and between said parties as follows: When in the course of the mining operations contemplated by the lessee and his associates, it becomes necessary to make a change in the method of operating to the underground system, the lessee, his associates and assigns may take such time as is actually necessary to make such change, without forfeiting their rights as lessees. But such change, when begun, must be completed as soon as it can reasonably be effected. The said M. M. Mauney and Bettie Mauney, his wife, in consideration of the benefits of said lease, hereby let and leased to the said Howard A. Millar, his associates and assigns, the tract of land designated upon the plat of the town of Kimberly, as 'Miller Diamond Washing Plant,' which plant is recorded in the office of the recorder of Pike County, Arkansas; said parcel of land being east of Garnet street and south of Gosnell street, in said town of Kimberly; also all of the land east of said tract and south of the public road or Garnet street, lying west of Prairie Creek.

''The said lessors also agree with the said Howard A. Millar, his associates and assigns, to lease to them from time to time such land as they may need for flooring purposes in the east half of the northwest quarter of the

southeast quarter of section 20, township 8 south, range 25 west, and that part of the northeast quarter of the southeast quarter of section 20, township 8 south, range 25 west, lying west of Prairie Creek, at an annual rental of $6 per acre. And the said lessees are to notify the lessors at least one year in advance of the amount of land they will need for flooring purposes in order that the lessors may use or lease to others such of said land as is not needed by the lessees, for agricultural or other purposes. But the rights given by this supplemental agreement are not to extend beyond the life of said lease.''

Appellants in their answer denied each of the allegations of the complaint with respect to their acts constituting an abandonment of the contract, and alleged that they had been proceeding in good faith in the performance of the contract, notwithstanding the conduct of appellees in attempting to obstruct them in various ways in the performance of the contract. Appellants alleged that appellees had harassed them with numerous lawsuits and with criminal prosecutions, and in various other ways unnecessary to mention in this opinion. They further allege that they had been hindered by the wartime conditions from prosecuting the work of operating the mine by reason of the fact that labor was scarce, that diamond mining had been declared among the nonessentials by the Government authorities, that many of the employees had been drafted into the army, and that appellants themselves had been drafted into war work. They also alleged that there were no facilities in this country for cutting and polishing small diamonds and that war conditions prevented appellants from having that work done abroad. They allege that, notwithstanding these hindrances, they had washed the minimum amount of dirt as specified in the contract up to the commencement of this action. It was also alleged in the answer that it had been determined in December, 1917, that it would be necessary to resort to the underground system of mining as provided for in the supplemental contract, and that war conditions had prevented the prepara-

tion for the change, but that appellants had now "located the place for the constructing of the shaft, and that it would be necessary probably to go to a depth of 500 feet to determine whether or not the diamond bearing dirt is offset by the nondiamond-bearing rock, and that unless it does exist to a depth of 500 feet there is not sufficient quantity of diamond-bearing dirt to justify the expenditure of the sums necessary to commercially mine the land," and that "it has been found advisable to construct this shaft off of the Mauney property, and that before they can go to this expense it is necessary that the court construe the lease as to whether or not they have the right to construct this shaft off the Mauney property." The answer contained a cross-complaint, the prayer of which was that the court construe the lease "as to whether they will be required to wash 10,000 loads of dirt before a new plant can be erected, and decide whether they can construct the diamond mine shaft off the Mauney property."

On the trial of the cause the chancellor decided that there had been an abandonment of the contract by appellants, and entered a decree canceling the contract. The decision of this court in the former case is conclusive of the fact that there had been no abandonment of the contract up to this time. This suit was begun a short time after the decision in this court, and, as stated in the former opinion, the right of action "extends back no farther than the last of the adjudications" between the parties.

There is a conflict in the testimony as to whether or not appellants had washed the minimum quantity of dirt specified in the contract, viz., 10,000 loads per annum; but we are of the opinion that, according to the preponderating weight of the evidence, appellants had complied with the contract to that extent. The testimony on this subject introduced by appellee is fragmentary and indefinite, whilst that introduced by appellants is direct and positive. Appellants kept an accurate account of the amount of dirt washed from the Mauney mine, and it ex-

ceeds the minimum amount specified in the contract. We think the proof does not show that there was an abandonment of the contract, nor that there was merely a desultory attempt to comply with its terms sufficiently to escape the charge of abandonment.

We are of the opinion that the evidence shows that appellants were attempting in good faith to perform the contract the best they could in the untoward circumstances which surrounded the venture. We held in the former opinion that, there being no forfeiture clause in the lease, nothing short of complete abandonment of performance of the contract would justify a court of equity in granting relief by canceling the contract.

The question introduced in the present litigation concerning the change in methods of mining from surface mining to the underground system is one which was not involved in the former litigation. It appears from the testimony that during the progress of mining operations it was discovered that most of the washable ground on the small five-acre tract constituting the Mauney mine was covered with non-diamond bearing rock, which obstructed access to the dirt and that on this account it was necessary to change to what is termed in the supplemental contract as the underground system, by tunneling under this rock, which was of uncertain thickness, possibly 500 feet. The engineers decided that it was necessary to sink a shaft or slope under the rock, and that on account of proper drainage it was necessary to start the shaft or slope just off this property on the adjoining property rather than on the leased premises. These facts are set up in the answer and cross-complaint of appellants, and are established by the testimony which they introduced. These facts are not controverted by appellees. Appellants present these facts as one of the answers to the charge against them of having abandoned operations, and also ask for the construction of the contract so that they may know whether or not they are within their rights in starting the shaft off of the leased premises. It is proper, therefore, for us to consider this

feature of the contract and to construe it in order to ascertain whether or not the appellants are proceeding ,by a method not authorized by the contract. The testimony is not elaborated so as to show whether or not the particular spot selected as the location for starting the downward shaft is well chosen, or that it is necessarily the only place for it, nor even is it shown that it is absolutely essential that a shaft be started off of the leased premises, though the testimony is that it was found necessary by the engineers to do so, and that this place was selected as the proper location. If, as a matter of fact, it is unnecessary to go off the leased premises to start the shaft, or if the selection of the particular location is such as to operate to the disadvantage of the mining operations, appellees would have the right to interfere, but the question is presented as a matter of defense, and we deem it proper to decide it, whether or not under the contract appellants have the right to start the shaft off of the leased premises if it is found necessary to do so in order to properly reach the washable dirt under the rock on the leased premises.

We are of the opinion that they have that right under the contract, for there is nothing in the letter of the contract which forbids it. The controlling feature of the contract is to test and develop a mine and to operate it for a period of fifty years for the mutual profit of the lessors and the lessees. The supplemental contract grants to appellants unqualifiedly the right to change to the underground system. If it was intended to restrict the rights of appellants in the selection of the method of operating the underground system, it should have been made to appear by the letter of the contract, or by fair and necessary implication. The contract contains no expression to that effect, nor can it be implied from the language of the contract. The rule is laid down in an encyclopedia that ''where a coal lease simply provides that the lessor has leased all the coal underlying his land and does not expressly require the sinking of shafts, the lessee is not bound to open the mine by means of a shaft

on the lessor's land, but may do so by means of a shaft and drift from other land, provided he uses reasonable diligence.'' 27 Cyc. 707. The following authorities cited, support the text: *King* v. *Edwards,* 32 Ill. App. 558; *Van Meter* v. *Chicago & Van Meter Coal Mining Co.,* 88 Ia. 92; *Lewis* v. *Fotheringill,* L. R. 5 Ch. 103; 17 Eng. R. C. 766; *James* v. *Cochrane,* 7 Exch. 170; *Wheatley* v. *Westminster Brymbo Coal & Coke Co.,* 22 L. T. R. (N. S.), 7.

It is important to consider that feature of the contract which provides that when the lessees "become fully convinced that diamonds or other valuable minerals do not exist in the said leased land in commercially paying quantities, and that further operations for this reason would not be warranted, then the said lessee and assigns may, at their option, surrender and cancel this lease without further obligation.'' They are required under the contract to operate the mine in good faith, but they are not compelled to do so when in good faith it is determined that the mine can not be successfully operated. This gives them the right to determine the means and method of operating, and, as before stated, there is nothing in the contract which limits their underground method to sinking the shaft on the leased land itself.

Our conclusion is, therefore, that they are within their rights when it is shown that it is reasonably necessary to start the shaft off of the leased land, and that the selection of such a location does not constitute a departure from the terms of the contract so as to be treated as an abandonment.

The conclusion of the chancellor on the question of abandonment is, we think, against the preponderance of the testimony, and the decree is therefore reversed, and the cause is remanded with directions to dismiss the complaint for want of equity.

HUMPHREYS, J. (dissenting). The sole purpose of the contract, the alleged breach of which is made the

basis of this suit, was that the 10 acres of land covered by the lease might be developed and operated as a diamond mine within the shortest practicable period of time. To that end, it was provided in the lease that the lessees should proceed in good faith and with diligence to wash as much dirt as could reasonably be washed in excess of 10,000 loads of dirt each year for the recovery and extraction of diamonds. The purport of the contract was that much more than the minimum amount of material should be washed. Touching upon this phase of the contract in the case of *Mauney* v. *Millar,* 134 Ark. 15, this court said: ''The contract clearly contemplated a persistent effort to develop the mine. It provides for a minimum amount of dirt to be taken out and washed, but further provides that the work shall be carried on with diligence, and that as much as reasonable should be taken from the mine.'' It was also announced in that case that a substantial failure on the part of the lessees to carry out the terms of the contract would work a forfeiture thereof and entitle the lessors to a rescission of the contract and cancellation of the lease. The complaint in the instant case charged that appellants had failed to wash as much dirt for the recovery and extraction of diamonds as was reasonably possible, with the facilities at hand, between April 10, 1917, and April 10, 1918. This allegation was controverted. The evidence of many witnesses was directed to this issue. After a careful study and elaborate analysis of the evidence, the chancellor found this issue with appellees. The finding of the chancellor is supported by a decided preponderance of the evidence. There is scarcely any dispute in the testimony to the effect that the plant was not operated over one-half of the time between these dates, and, by a great weight thereof, not over one-fourth of the time. The most appellants contend for in this particular is that the minimum amount of dirt, to-wit, 10,000 loads, was washed. The excuse offered for not washing more finds scarce, if any, support in the

evidence. The exigencies of the war are interposed as
an excuse. The evidence failed to show that the em-
ployees of the mine were affected by the draft between
April 10, 1917, and April 10, 1918. Only two negroes
were subject to draft, and, according to the clerk and
members of the local board, they were not drafted until
after April, 1918. The general proof upon the supply
of labor in that particular community was to the effect
that there was plenty of labor to be had during that pe-
riod of time. In fact, there is evidence tending to show
that applications for labor were declined. Unnecessary
litigation was also offered as an excuse for not milling
more dirt, but the record fails to show that any litigation
was pending during that period which materially inter-
fered with the progress of the work. It developed that
the plant was destroyed, but this did not occur until
long after the expiration of the particular period of
time in question. As further excuse or justification for
not milling more dirt, appellants alleged the execution
of a supplemental contract to the original, permitting
them, when necessary, to change from surface to under-
ground mining, and it provided that, during the time
necessary to make the change, appellants should be ex-
exempt from washing dirt. It is also alleged that, in
order to change to an underground system of mining, it
will be necessary to move the plant from Kimberly and
sink a shaft to the depth of about 500 feet on adjoining
land and tunnel from the shaft through other land and
under the land covered by the lease; and that it will be
necessary to postpone the sinking of the shaft until a
construction of the supplemental lease can be had by
the courts, in order to ascertain whether the plant can
be removed from Kimberly to, and the shaft sunk on,
adjoining lands. In the first place, the necessity for
changing from surface to underground mining is not
sufficiently established by the evidence. According to
the great weight of the evidence, the diamond bearing
dirt on the surface has been exposed and is ready for

treatment for the recovery of diamonds. Under the terms of the supplemental lease, the lessees were not given authority to determine when underground mining became necessary. That was an open question, and, before such change could be justified, the necessity or exigency must actually exist. As before stated, the weight of the evidence in this case shows that no such exigency had arisen. Nor did the supplemental contract warrant a discontinuance of surface mining until a construction of the contract could be obtained from the courts. The mere fact that contracts are ambiguous, or susceptible to several constructions, will not warrant a delay in the execution thereof during the pendency of suits for the construction thereof. If this were the law, delays in the execution of contracts would be innumerable and the courts flooded with such suits. Nor does the supplemental contract contain any warrant for developing the mine and sinking the shaft for that purpose on adjoining land. The purpose of the contract was to develop, as rapidly as possible, a producing mining plant at Kimberley, on the land leased. The supplemental lease must be read in connection with the original lease, and the original lease calls for the mining site to be at Kimberley, and not on adjoining lands. It was provided in the original lease that the lessors might have the right to enter upon the lands and constantly inspect the operations so as to protect themselves from loss of diamonds in which they shared under the terms of the lease. To place such a construction as appellants contend for on the supplemental lease would deprive appellees to a large extent of these protective reservations in the original lease. There might be some basis for the construction placed upon the supplemental contract by appellants if they had purchased all the diamonds on the land in question, because, in that event, it would not concern appellees very much as to the manner in which they were procured, whether by surface mining or by underground mining, or whether the mine underneath was reached by

shaft and tunnel on adjoining lands or on the lands in question. But, where the purpose of the lease was to develop a great commercial mine, its location and the manner of reaching it were of great moment, especially when the lessees, under the terms of the contract, had an interest in every diamond recovered.

The desultory and ineffective manner in which appellants attempted, during the period in question, to develop the mine, constituted a substantial failure on their part to carry out the contract according to its terms. For this reason, I think the chancellor's decree should have been affirmed.

Mr. Justice HART concurs with me in this dissent.