[Civ. No. 4295. Third Appellate District.—February 17, 1932.]

ELIZABETH F. WINSHIP, Appellant, v. A. G. WILKES et al., Respondents.

Louis Luckel and J. L. Murphey for Appellant.

Louis Titus, *in pro. per.*, Joe Crider, Jr., Clarence B. Runkle and Jones & Dall for Respondents.

PARKER, J., *pro tem.*—On August 1, 1923, appellant was the owner of a tract of land containing approximately fifty-six acres, situate in the county of Los Angeles, lying a short distance easterly from the Torrance oil-field. On that date, appellant made a lease of this property to respondents Wilkes and Titus. This lease granted lessees the exclusive right of prospecting said premises for oil and gas, and of drilling for and removing oil and gas from the property. The lease obligated lessees to commence drilling a well within ninety days from the date of the lease and to continue drilling with diligence "until a depth of 4,500 feet has been reached, unless oil at a lesser depth is discovered in quantities deemed paying quantities by the lessees. It is understood and agreed that any well commenced shall be fully completed by said lessees."

The plaintiff, claiming that there was a breach of this agreement to drill and complete a well and being still the owner of the land, brought this action against respondents Wilkes and Titus to recover damages for such alleged breach. Respondent Fidelity and Deposit Company of Maryland was joined as defendant because it had become surety on a bond of lessees in the sum of $10,000, conditioned on the completion of one well. The answer denied the breach and further denied that any damage had resulted, even had there been a breach. The court below was of opinion that there had been no breach of the agreement and therefore entered judgment for defendants. From this judgment appellant is prosecuting this appeal, claiming that the record shows both a breach of the agreement and that substantial damage has been sustained. Respondent Fidelity and Deposit Company of Maryland was merely a surety on the bond of lessees, having nothing to do with the contractual relations between appellant and respondents Wilkes and Titus. For convenience, therefore, wherever the word "respondents" is used in this opinion it means respondents Wilkes and Titus, unless otherwise specifically stated.

The first question presented and the main question involved is one of construction. The controversy hinges upon that portion of the lease quoted, with particular reference to the words "in quantities deemed paying quantities by the lessees". There is another provision of the lease

reading as follows: "A well in paying quantities is hereby defined as a well which, after having been pumped continuously for a period of thirty days, shall produce at least one hundred barrels of oil per day."

It is the contention of appellant that the obligation imposed upon the lessees, by virtue of these provisions, read together, was that the latter should drill to a depth of 4,500 feet unless at a lesser depth oil was discovered in quantities which, after having been pumped continuously for a period of thirty days would produce at least 100 barrels per day. It is to be noted that it is not claimed that the *discovery* must be of sufficient quantities to produce 100 barrels per day. The requirement, giving the contention its fullest scope, is that the discovery must be in such a quantity as will after having been pumped continuously for thirty days yield 100 barrels per day. It seems obvious that the extent of the discovery is to be determined by some future test. In other words, regardless of the quantity discovered, a development to a point where after thirty days' pumping the well would produce 100 barrels per day would fulfill the requirements of a well in paying quantities. There is a clear distinction between discovery and development.

Further prefacing the general observations, it may be assumed that the underlying phase of the contract before us was to prospect the ground leased and that prospecting ceases upon discovery and the ensuing effort becomes one of development. Inasmuch then as the test of the discovery remained *in futuro* it was, to a great degree, difficult to foresee the result of the test. It is quite within a common experience to note, with reference to all fields of mining activities, whether lode, placer or oil, that the transition from ardent anticipation to regretful remorse is often almost instantaneous.

If, then, the conditions of the lease require that the lessee must drill 4,500 feet unless at a lesser depth he discovers oil in quantities sufficient to insure production on pumping of 100 barrels per day after thirty days' pumping the risk of the future test rests entirely upon the lessee and he would be left to hazard the extent of any discovery short of the specified depth, which result might and perhaps would destroy the very purpose of the enterprise. But the very terms of the lease negative the idea. The lessee is

permitted to cease drilling, not when oil is produced or developed in the quantities specified as paying quantities but when he discovers oil which in his judgment will upon development produce the quantity.

The strongest argument of appellant goes only to the extent that we must read the two provisions as one. Let us accept this and rephrase the lease to meet the demand. The result is a lease reading as follows: "Lessee will drill a well until a depth of 4,500 feet has been reached unless oil at a lesser depth is discovered in quantities deemed by the lessee sufficient to produce one hundred barrels of oil per day after the well has been pumped continuously for thirty days." To repeat, the essence of the exception is discovery. Should we disregard entirely the words "deemed by the lessee" our difficulties would be overcome; indeed, no difficulty would arise. But we know of no rule of law permitting us to so ignore the terms of a contract and thereby make a new contract for the parties. It is true, that where a conflict exists in the terms of an instrument words may be eliminated or added if necessary to harmonize the context.

However, there appears no conflict. The words "deemed by the lessee" need no construction. The word "deem" is not an unusual word nor has its use been confined to legal phraseology. It is a word in common use and imports, in all of its shades, some idea of discretion and opinion. To deem is to think, judge, hold as an opinion, decide or believe on consideration, to adjudge. (*State* v. *Cohen,* 73 N. H. 543 [63 Atl. 928].) And without going further into the construction placed upon the word we merely refer to the three editions of "Words and Phrases" under the heading "Deem". And perhaps equally determinative of the meaning intended here we may look to the instrument itself. A provision in the lease, with which provision we are not particularly concerned, gave to the lessee the right to continue in possession beyond the twenty-year period of the lease "so long thereafter as oil and gas may be produced on the demised premises in paying quantities", and the lease then further provided that the term "paying quantities" as defined should not apply to the wells operated after the twenty-year period, but that in such a case the "lessee may operate such wells as they *shall deem*

sufficiently productive to operate''. Nothing could more clearly demonstrate that the parties had knowledge of the use and import of the term. How can it be said that for one purpose the parties understood the term and that its use in another part of the same instrument was merely epithetical and of no purpose? From the foregoing we conclude that the contract can be given its fullest and complete effect by a construction which leaves the extent of the discovery to the sound judgment and discretion of the lessee. However, such judgment cannot be arbitrarily or unreasonably exercised. Therefore we may inquire into the conduct and actions of the lessees.

Work was commenced and diligently prosecuted until the well had attained a depth of 3,560 feet, at which point oil was discovered and these oil conditions extended down to about 3,780 feet. When the oil was encountered, and after examination thereof and thorough investigation of the quality and base, the lessee determined that paying quantities could be produced and proceeded to complete the well for pumping, which included further drilling to 3,780 feet. The cost of the completion, at this depth, was $20,000, while the cost of going down the additional 800 feet was stipulated at $25,000. When the well was completed an attempt was made to produce oil from said well, but the same failed to produce oil in paying quantities.

The lands involved are situate contiguous or adjacent to what is termed proven oil grounds, known as the Torrance field. In other words, speaking somewhat loosely from a strict geological standpoint, it had been demonstrated that an oil pool or reservoir underlaid the surface at some depth.

The operating lessee was a man of wide experience in the field. He had operated a number of wells successfully and from his own experience and his knowledge of the experience of other drilling companies had acquired an accurate understanding of the characteristics of the geological formation. It was the common experience that the oil was found around 3,800 or 3,900 feet and at times somewhat closer to the surface. This lessee had theretofore drilled a well about one-half mile distant from the well here. This former well we refer to as the ''Oakley Well''. In the Oakley well he discovered oil at almost exactly the

same depth at which it was discovered in the Winship well, as we will refer to the well drilled under the lease now before us. The Oakley well was carried to 3,800 feet and produced 600 barrels a day for a considerable period and then made 200 barrels a day for several months. Previous to that the lessee had drilled wells further to the west with practically the same experience. The uncontradicted testimony is that there is, in the Torrance field, only one oil sand from which oil may be obtained and that is the same sand as discovered in the Winship well and that this sand is in the zone, commencing at 3,400 feet and down to an extreme depth of 3,900 feet; that this is the only zone and every producing well in the field produces from that zone. No well in the field ever produced oil from any other zone. At the time oil was discovered in the Winship well the discovery was in this sand and there was an excellent showing of oil. Cores were taken, and the sand spread out and carefully and thoroughly examined and the drillers, superintendent and lessees were all of the opinion that there was another Oakley well or at least one that would produce more than 100 barrels per day on pump. The sand looked like the Oakley sand and was in the same zone at the same depth. It was also shown that at the time of the discovery there had been drillers who had passed the zone in other wells, some going to a depth of more than 5,000 feet and that the result in each case had been to find no further oil and they had come back to this zone and attempted production, some with success and others through various causes giving up the search. All of the foregoing standing uncontradicted supports the conclusion that the lessee's judgment and discretion were reasonably exercised.

The point is made that the failure to pump for thirty days negatives the idea of good faith. We might concede this, but still this one fact is but one of a series and the remaining facts overcome its force. However, the record discloses that the lessee proceeded in the recognized manner to test the well through all means generally employed and found the hole barren. It would have been a useless thing to pump for thirty days or for any other period if there was no oil to justify it.

Appellant argues in generalities about the rights of the owner to have a well drilled 4,500 feet. If she desired a

well 4,500 feet deep on her property she should have contracted expressly for its being drilled. The purpose and object of the lease was not to dig a hole as such, but to prospect for oil. The owner apparently did not care to undertake the risk of failure or bear the expense incident thereto. The lessee would hardly have undertaken the project in territory wholly unproven. It was a chance wherein both parties gambled.

█ Where the plain, unambiguous wording of a contract permits a complete fulfillment of the obligations assumed and promotes the objects of the agreement that construction is to be preferred to one dependent upon forced addition to or elimination of the terms of the writing. We hold that the contract was not breached and therefore and thereby adopt the holding of the court below.

The judgment is affirmed.

Plummer, J., and Preston, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 18, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 14, 1932.

Seawell, J., and Shenk, J., dissented.