[Civ. No. 11303.   First Appellate District, Division One.—August 29, 1940.]

LOUIS RICHARDSON RANCH, INC., (a Corporation), Respondent, v. FRANK J. GIBSON et al., Appellants.

Lawrence Hall, Havelock Fraser, Wm. H. Cree and Cree & Brooks for Appellants.

W. Cloyd Snyder for Respondent.

KNIGHT, J.—Plaintiff brought this action to establish a forfeiture of an oil and gas lease for non-compliance with provisions of the lease requiring that drilling of a well be commenced by a certain date and thereafter prosecuted with due diligence. From a judgment for plaintiff, defendants appeal. They contend that grounds for forfeiture did not exist and that the lease is still in effect.

The lease was executed on May 6, 1936, by plaintiff Louis Richardson Ranch, Inc., as lessor, and defendant Frank J. Gibson as lessee, and covered one hundred acres in Ventura County. Gibson was also given a lease on adjoining property owned by Meda K. Richardson. On July 20, 1936, both leases were assigned to defendant George Duty, Gibson re-

taining a four per cent royalty interest. Defendant Sherrod had introduced Gibson to the lessor and thereafter worked for Duty, but was not shown to have any interest in the lease.

The lease provided that it should terminate unless drilling was commenced within ninety days from its date, provided that if commenced within thirty days, the sum of $500 paid upon execution of the lease should be returned to the lessee, and if not commenced within thirty days, but within sixty, $250 of this sum should be repaid. Drilling was not commenced within ninety days, but on August 2d an extension was granted to August 9th. Subsequently time was extended to August 16th, and thereafter to August 21st. At the time of granting the extension to August 21st, the lessor agreed to extend the time to September 3d if Duty would release the south forty acres of the lease, and the south forty acres of the Meda K. Richardson lease, but Duty did not avail himself of this offer. Defendant Duty represented to Mr. Snyder, president and attorney for plaintiff, that his delay was due to the fact that work was being done on his drilling equipment at Long Beach.

Actual drilling commenced about midnight on August 20th, but the lessor contends that it was not prosecuted with due diligence in that the derrick was not wired for electric lights and therefore continuous drilling could not be maintained. On September 5th, the board of directors of plaintiff corporation held a meeting upon the property, and, according to the testimony of Mr. Snyder, president of plaintiff, he informed the man in charge for defendant Duty that unless there was a showing of diligence it might be necessary to cancel the lease. Snyder suggested that since there had not been due diligence, Duty should put up a $10,000 bond to assure performance.

On September 10th, Snyder wrote to Gibson and Duty that there had been a breach of the obligation of diligent performance, and any further work would be done at their peril; that upon his return from his vacation he would ask the board for cancellation of the lease. No reply was received to this letter. On September 26th, Snyder wrote to Gibson and Duty that on the preceding day the board had cancelled the lease. Action was filed on September 29th.

The court found that actual drilling had commenced on August 21st, within the last extension, but that it had not been commenced in good faith, in that Duty did not have the finan-

cial ability to carry on and complete the well, and had obtained the extensions by falsely representing his financial ability. It further found that drilling had not been carried on with due diligence, or with any diligence, and that on or about September 6, 1936, defendant ceased operations without sufficient cause or reason.

Defendants' contention is, in effect, that the evidence is insufficient to support the findings which are adverse to them. Defendants further contend that under the lease the plaintiff was required to give notice allowing time to remedy any breach of the obligation of due diligence before declaring a forfeiture.

Defendants take the position that diligent operation did not require continuous drilling; that it would have delayed further the commencement of drilling if the derrick had been wired for night work. Defendants point to the fact that between August 21 and September 5, 1936, the well was drilled to a depth of between 280 and 290 feet. During that period the conductor pipe developed a leak three times, and it had been necessary to stop drilling and recement it, according to testimony on behalf of defendants. The cementing of the first two repair jobs, permitted to set over night, had not held, and on September 5th, when the board of directors came to the lease, it had been recemented a third time. The intent was to let it set several days before starting again. Defendants also offered evidence of other mechanical trouble due to a twist-off.

As a justification for not resuming operations after the shutdown of September 5th, defendants rely on the statements of the board of directors when they visited the lease on September 5th and the letter of September 10th, in which Snyder informed the defendants that work thereafter done was at their peril, and that on his return from his vacation he would ask the board to cancel the lease for breach of the obligations of the lease in respect to drilling. Drilling was not thereafter resumed. The position of defendants is that there was no lack of due diligence prior to September 5th, and that they were not required to continue operations after that date in order to hold the lease, in view of plaintiff's notice that it proposed to cancel. (Sec. 1511, Civ. Code.) The derrick and drilling equipment were still on the prop-

erty at the time of trial. Defendants' contention is that the lease is still in effect.

The court found, as noted above, that drilling was not commenced in good faith and that Duty did not have financial ability to carry on and complete a well. A number of workmen employed by Duty on the well were not paid in full until after they had filed claims with the labor commissioner. Payments of wages were made as late as December. Mr. Taylor, who furnished water from his pump on the Meda K. Richardson property to Duty, was not paid until October 31st, after he had filed a claim with the labor commissioner. Mr. Boswell, who supplied mud used in drilling the well at a charge of $218, received his last payment in January, 1937.

Defendant Duty testified that the derrick had cost $2,500 and that he owed $1200 on it at the time of trial. His drilling equipment, except for a few small tools, was rented on an unwritten contract to pay $50 a day rent from oil produced. From Duty's own testimony the trial court was clearly warranted in concluding that he was without adequate means to finance drilling of an oil well with due diligence.

The theory of plaintiff was that Duty was deliberately "stalling", awaiting the outcome of a well being drilled about a mile distant by the Honolulu Oil Co. If that well was a success, he would have no difficulty financing his well. If the Honolulu well proved dry, he could surrender the lease under a provision giving such right at any time.

Plaintiff lessor, on the other hand, was anxious that drilling proceed with dispatch. It wished a test of its land to be made without regard to the outcome of the Honolulu well. It had other offers to lease. If Duty was not going forward diligently, it wished to accept one of these offers, which likely would be withdrawn if the Honolulu well proved dry. According to the testimony of Snyder, he had explained the situation to Duty when granting extensions of the time to commence drilling and had received assurances from him that the lessor need not worry about his financial responsibility, that he had plenty of money to go ahead and not only drill this well, but all other wells that had to be drilled on the property. The court found that Duty procured these extensions by misrepresenting his financial status. Conflicts in the evidence on this point were resolved by the court in favor of plaintiff.

The measure of the obligation of due diligence is to be determined by the facts of the particular case, having regard for both the interests of lessor and lessee. In the present case it cannot be said that the court's findings as a matter of law are without support in the evidence.

The evidence shows, without dispute, that the derrick was not equipped with lights for night drilling. Whether, in the circumstances shown, due diligence required that drilling operations be carried on continuously was a question for the trial court. There had already been delay in commencing drilling, and although extensions of time to start had been allowed, the importance to the lessor of diligence had been emphasized. The sufficiency of the lessee's operations may depend on whether he is acting in good faith. That is, conduct which might be sufficient if the lessee is acting in good faith, may not satisfy the lease if good faith is lacking. In the circumstances the court was warranted in concluding that the defendant Duty, by reason of lack of proper financing, which he concealed from the lessor, had been unable to proceed with diligence, and that this inability was likely to continue.

It appears from the evidence that all extensions were granted by Snyder, acting for the lessor, when he visited the property and observed that drilling could not commence by the times agreed on; that Duty did not seek out the lessor and request time when he must have known that his equipment would not be ready to start drilling by the time fixed in the lease or within the first two extensions. Sherrod testified that after the board of directors of plaintiff visited the property on September 5th, in the absence of Duty, he talked with Duty on the telephone and told him that if lights were installed for night drilling he thought the lessor would be satisfied. But it does not appear that Duty made any attempt to communicate with the lessor with a view to adjusting the situation. Nor did Duty reply to the letter of September 10th, in which Synder charged him with lack of diligence, but stated that action would not be taken until he returned from his vacation. The court was entitled to consider Duty's conduct as above outlined in connection with plaintiff's contention that he was not acting in good faith. It may be that Duty honestly wished to carry on, that he hoped to obtain funds, but was disappointed. But his own testimony shows that he did not

have any reasonable expectations which warranted a belief that he could proceed with proper diligence.

Defendants contend that evidence of Duty's misrepresentation of his financial status was inadmissible under the pleadings, which did not allege fraud, and that in any event evidence as to his finances before August 21st or after September 29th was immaterial. The complaint alleged that there had been a lack of due diligence, that those operating under the lease had not in good faith complied with its terms, and that they had wilfully delayed operations without any intention of drilling. Under these allegations evidence of Duty's misrepresentation of his financial status was admissible as bearing on his good faith.

The court properly refused to limit the evidence to the period between August 21st and September 29th. Evidence as to matters before August 21st was relevant to show that the extensions were not procured in good faith, and the evidence as to matters which took place after September 29th, when plaintiff filed suit, such as the filing of claims by Duty's employees with the labor commissioner, was admissible as revealing his financial status before the forfeiture.

We conclude on this phase of the appeal that the evidence supports the trial court's finding of grounds for forfeiture for failure to commence drilling in good faith and prosecute it with diligence. This brings us to defendants' contention that even if Duty was in default, plaintiff was required under the lease to give notice of breach and time to remedy it before declaring a forfeiture.

Paragraph 17 of the lease includes the following: "Upon the violation of any of the terms or conditions of this lease by the Lessee excepting the payment of royalties in the manner herein provided and excepting the failure to commence or prosecute the actual drilling of any oil or gas well hereunder, and if the Lessee fails to remedy the same within sixty (60) days after written notice from the Lessor so to do, then, at the option of the Lessor, this lease shall forthwith cease and terminate, and all rights of the Lessee in and to said land be at an end, save and except as to any and all wells producing or being drilled and in respect to which Lessee shall not be in default . . . No time for remedying default, before cancellation, shall be allowed after failure to pay any royalties or rentals as herein provided, or for failure to commence actual

drilling of any oil well within the time herein provided for the commencement of drilling of such well.''

Note that the provision for a sixty-day notice is expressly made not applicable to a failure to commence or prosecute drilling operations. But the concluding sentence of the paragraph, which expressly provides that no time before cancellation shall be allowed after failure to pay royalties or rentals, or for failure to commence actual drilling within the time provided, does not include failure to prosecute drilling. From this omission defendants argue that time to remedy such a failure must be allowed, and since the sixty-day notice provision is not applicable in view of the first sentence of the paragraph, a reasonable time must be allowed. In defendants' analysis the forfeiture herein rests on the failure to prosecute drilling with due diligence, rather than any breach of the obligation to commence drilling.

We have heretofore referred to paragraph 4 of the lease, which provided that it should terminate unless the lessee should commence drilling within ninety days and thereafter prosecute drilling with due diligence. In *Scheel* v. *Harr,* 27 Cal. App. (2d) 345 [80 Pac. (2d) 1035], it was held that such a provision must be read with a paragraph providing for notice and time to remedy default, which in that case made no exceptions, and that an automatic forfeiture did not arise.

Paragraph 17 of the lease herein differs from the analogous provision in *Scheel* v. *Harr, supra,* in that it expressly provides that no time for remedying default before cancellation shall be allowed after failure to pay royalties or rentals, or for failure to commence actual drilling within the time provided, whereas in the cited case no exceptions were made.

In the case herein the court found that the extensions of time to commence drilling were procured by misrepresentations of Duty as to his financial status, and that although drilling was started within the last extension, it was not started in good faith in that Duty did not have financial ability to carry on and complete drilling of the well. The trial court properly concluded that drilling started under such circumstances did not comply with the obligation of the lease in regard to commencement of drilling, and that the lessor could declare a forfeiture under paragraph 17 without allowing time to remedy default. In the notice of September 26, 1936, declaring a forfeiture, failure of the lessee to commence drilling

as provided in the lease was included in stating the grounds of forfeiture.

In *Scheel* v. *Harr, supra,* the court found that drilling was not commenced in good faith, but in that case the lease made no exception to the requirement of sixty days' notice where the default consisted in failure to commence drilling within the time provided. The court accordingly held that a forfeiture could not be declared without allowing the sixty-day period.

Defendants further contend that notice of forfeiture did not comply with the lease. The lease provided: "All notices and communications addressed to the Lessee shall be mailed to Jack B. White, 16½ Pine Avenue, Long Beach, California." Defendant Gibson testified that before Duty commenced drilling he requested Snyder, president and attorney for plaintiff, not to send communications to White, but to send them directly to him, Gibson. White, according to Gibson, was a broker. Snyder complied with Gibson's request and after assignment of the lease to Duty also sent communications to Duty, in care of his attorney, addressed to the attorney's office. No claim is made that all communications did not reach both Gibson and Duty. In their answer they admitted receipt of the notice of forfeiture of September 26th, and the evidence shows their receipt of other communications. It was not shown that defendant Sherrod had any interest in the lease which would require notice to him. The notices sent to Gibson and Duty were sufficient.

The parties have argued at some length whether the rule that forfeiture provisions are strictly construed against the party entitled to their benefit applies to oil and gas leases on a royalty basis. Appellants insist that the exception, if it exists, should apply only where the lease covers proven territory. It is said that the threat of loss of oil through drainage if the remedy of prompt forfeiture is circumscribed explains the exception. (*John* v. *Elberta Oil Co.,* 124 Cal. App. 744 [13 Pac. (2d) 538] ; *Slater* v. *Boyd,* 120 Cal. App. 457 [8 Pac. (2d) 182] ; *Hall* v. *Augur,* 82 Cal. App. 594 [256 Pac. 232].) This danger is also present where, as in the instant case, another well is being drilled near by in unproven territory. If the other well is a success it may draw oil from near-by land to the prejudice of owners who are tardy in drilling. Furthermore, while the parties concede that plain-

tiff's land was wildcat in that it was beyond the known limits of a proven field, the evidence shows that on the leases adjoining plaintiff's land on the east there were a number of wells, including a well about one hundred yards distant from Duty's well. In the present case we need not resolve the question as to whether an exception to the rule of strict construction of forfeiture provisions should be made as to royalty oil leases under all or some conditions, for it is not necessary to indulge in liberality of construction to support the trial court's reasonable interpretation of the lease herein. The lease was prepared in the office of Mr. Snyder, president of plaintiff corporation, with the result that uncertainties would be resolved against the lessor. But we are of the view that there is no uncertainty in the lease as to the right of the lessor to forfeit without allowing time to remedy default where there is a failure to commence drilling in good faith as shown by the evidence herein.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.