[Civ. No. 3035.   Fourth Dist.   Apr. 28, 1942.]

WELPORT OIL COMPANY (a Corporation), Respondent,
v. FREEMAN E. FAIRFIELD et al., Appellants.

534

Pease & Dolley and Arthur B. Knight for Appellants.

Harvey, Johnston & Baker for Respondent.

MARKS, J.—This is an appeal from a judgment quieting title to certain leasehold interests in 60 acres of land in Kern County.

R. H. Anderson, Inc., owned the property in question here in fee. In November, 1936, that corporation, as lessor, entered into an oil lease with Welport Oil Company as lessee, leasing 200 acres of land to be drilled for oil. This lease gave the lessee the right to drill for oil to a depth of not greater than 2,000 feet and provided that: "It being expressly understood that the Lessor hereunder is retaining all rights to oil, gas or other hydrocarbon substances located two thousand (2,000) feet or more below the surface of the ground." This lease was duly recorded.

Under date of January 1, 1940, plaintiff entered into an oil lease with Freeman E. Fairfield covering 60 acres of the same property. This lease limited drilling to "a depth of not greater than 2,000 feet," and reserved to the lessor all oil, gas or other hydrocarbons below that depth. During the following month Freeman E. Fairfield and his wife subleased the same property to C. R. Price and Company, the contract containing the same restriction as to the depth of the wells to be drilled. During the same month C. R. Price and Company subleased the same property to Mid State Petroleum Company with the same restriction on the depth of the wells.

The Welport Oil Company-Freeman E. Fairfield lease contained the following provisions which are important here:

"3. The Lessee agrees to start the drilling of a well for oil within thirty (30) days from the date of this agreement, and to continue the work of drilling such well after commencing the same with due diligence until a depth of not greater than 2,000 feet has been reached, unless oil is discovered in paying quantities at a lesser depth, or unless such formations are encountered at a lesser depth as will indicate

to the geologist of the Lessee that further drilling would be unsuccessful. If by reason of encountering mechanical difficulties in the prosecution of work, or other causes, the Lessee shall determine to abandon the same, this lease shall continue in full force, provided a new well is commenced within ninety days and thereafter drilled diligently as hereinabove provided.

"4. After discovery of oil in paying quantities in the first well the Lessee agrees to commence the drilling of a second well within 90 days thereafter, and after the discovery of oil in paying quantities in said well and each succeeding well, to similarly commence the next succeeding well until 6 wells have been drilled, including offset wells. . . .

"16. A well in paying quantities is hereby defined as follows: 'Paying quantities' as used in this Section shall be considered as such production as in the judgment of Lessee will be sufficient reasonably to assure a profit over and above the cost of drilling and producing such well.

"This definition shall not apply to wells to be operated on the expiration of the twenty-year period or on the abandonment of a portion of the premises, and in such case the Lessee may operate such wells as Lessee in its discretion shall deem sufficiently productive to operate. . . .

"21. In the event of any breach of any of the terms or conditions of this lease by the Lessee, and the failure to remedy the same within ninety days after written notice from the Lessor so to do, then, at the option of the Lessor, this lease shall forthwith cease and determine, and all rights of the Lessee in and to said land be at an end."

The Mid State Petroleum Company (hereafter called Mid State) caused the drilling of a well to be started about the middle of February, 1940. It was drilled to a depth of 1,214 feet. The last drilling was done on March 18, 1940, when an attempt was made to put it on production. It continually sanded up and was not placed on steady production until about August 17, 1940, although some oil mixed with mud and water was produced from it each month during that period.

Under date of June 18, 1940, plaintiff served on Freeman E. Fairfield a written notice to remedy default under the terms of his lease with plaintiff. The default specified in the notice was failure to comply with the provisions of paragraphs three and four of the lease, the material parts of

which have been quoted. This notice was received on June 19, 1940.

On September 18, 1940, plaintiff served on Fairfield a written notice of termination of the lease because of failure to remedy the default specified in the earlier notice.

Under the terms of the lease the right of the plaintiff to declare a forfeiture is dependent upon a breach of the terms of the lease by the lessee and the lapse of ninety days after written notice of the default without remedying it.

It seems to be conceded by counsel that the right to forfeit the lease must be limited to those breaches of its terms specified in the first notice of June 18, 1940. Counsel for plaintiff states that the breaches relied upon are as follows: (1) Failure to drill the well to a depth of not more than 2,000 feet as oil in paying quantities was not found at a lesser depth. (2) If it be considered that the well produced oil in paying quantities, the failure to commence drilling a second well within ninety days thereafter. (3) If the well did not produce oil in paying quantities, the failure to deepen it to the specified depth.

It is clear from the record that drilling stopped on March 18, 1940, and was not thereafter resumed; that Mid State diligently tried to put the well on steady production and did not succeed in doing so until August 17, 1940. That due diligence was used in this endeavor does not seem to be questioned.

If the well produced oil in paying quantities it became the duty of Mid State to start drilling a second well within ninety days. Ninety-two days elapsed between March 18, and June 18, 1940, the respective dates that drilling stopped and the giving of the notice of breach of the terms of the lease.

In considering the claimed default of Mid State in failing to use due diligence in its drilling operations it should be borne in mind that the contract gave it the absolute right to allow ninety days to elapse between the discovery of oil in paying quantities in one well and the commencement of the drilling of the succeeding well and that no default could have been predicated on Mid States' use of all that time before starting the later well. It is also true that under the contract the question of whether or not a well produced oil in paying quantities was left to the discretion of Mid State. It is therefore apparent that the plaintiff only gave Mid State two days in which to determine the productivity of the well.

Defendants argue that this notice was prematurely given as they should have been entitled to a reasonable time after drilling stopped within which to determine whether or not the well could produce oil in paying quantities. The lease does not define a well producing oil in paying quantities but in paragraph 16, which we have quoted, leaves the determination of that question to "the judgment of the lessee." Mid State was given but two days to determine that question before the specified ninety days in which it should start a second well commenced to run if the notice of June 18, 1940, be considered as given in proper time and not as prematurely given. Under the notice plaintiff must have considered the question of the productivity of the well settled on March 20, 1940, ninety days before the date of the notice, otherwise its notice was prematurely given before Mid State was in default.

It seems to be established that in attempting to enforce the forfeiture clause of an oil lease the lessor is bound by and must conform to the terms and conditions of the lease and that a notice prematurely given can have no effect and cannot support a judgment quieting title against the drilling company. (*Scheel* v. *Haar*, 27 Cal. App. (2d) 345 [80 P. (2d) 1035]; *Sandrini* v. *Branch*, 32 Cal. App. (2d) 707 [90 P. (2d) 593]; *Forney* v. *Shell Oil Co.*, 137 Cal. App. 114 [29 P. (2d) 864]; *Smith* v. *Edelman*, 214 Cal. 488 [6 P. (2d) 508].)

Therefore, the first question confronting us is this: Assuming the well to be a commercial producer, was the notice of June 18, 1940, prematurely given? The answer to this question obviously depends on whether or not the drilling company had a reasonable time after drilling stopped to determine if the well would produce oil in paying quantities and if two days before the ninety-day period commenced to run constituted such reasonable time.

Section 3217 of the Public Resources Code provides as follows: "A well is completed, for the purposes of this chapter, thirty days after it has commenced to produce oil, water, or gas, unless drilling operations are resumed before the end of the thirty-day period."

If the provisions of this section are applicable here (which we are not required to hold) then the ninety-day period within which Mid State was required to start the drilling of a second well would not have expired until July 16, 1940, and the notice was prematurely given and cannot support the sub-

sequent notice of cancellation which also would have been prematurely given.

As the lease did not define a well producing oil in paying quantities but left the determination of that question to the discretion of the operating company, it seems to follow as a matter of course that Mid State was entitled to a reasonable time in which to put the well on steady production and make its decision on that matter. Where, as here, the well was a small producer, and continually sanded up, thus producing oil only intermittently, it cannot be held that two days before the ninety-day period started to run was a reasonable time within which to decide that important question. What would be a reasonable time in which to determine the productivity of the well was a question of fact addressed to the trial judge upon which he failed to find. No rule can be laid down to govern all cases, the facts of each case must control. Where the well is a good producer the question is easy of prompt determination, but where, as here, the well was a small producer and sanded up many times, a sufficient time should have been given in which to determine its productivity with the use of skill and the exercise of due diligence.

We have thus far considered the case and the obligations of the parties under the assumption that the well was a commercial producer. We must now consider the duties of the parties under the assumption that the well did not produce oil in paying quantities. Under such circumstances the obligations of Mid State are set forth in paragraph 3 of the lease. They are to continue drilling "with due diligence until a depth of not greater than 2,000 feet has been reached" unless oil in paying quantities be discovered at a lesser depth. The obligation to continue drilling is a continuing one and the facts here present the question of what was the exercise of *due diligence* under them.

Mid State had found an oil sand at a depth of 1,214 feet. We are not referred to and cannot find the log of the well in the record so we know nothing of the depth of the strata. [3] It is common knowledge in the oil industry that in drilling an oil well with modern equipment mud is forced into the oil strata which impedes the prompt flow of oil; that when there is a reasonable gas pressure and considerable oil, this mud ordinarily is removed within a short time; that where the quantity of oil and the gas pressure both are small, the cleaning process may take considerable time. It is also common knowledge

that some oil wells sand up for a considerable time before steady production can be obtained.

▋ Where an oil sand is found and the well does not immediately clear up and produce oil, must the operator shut off that strata and proceed to drill through it in search of other oil sands before thoroughly testing the productivity of the sands found? We think not, as any such conclusion would result in the serious loss of natural resources in a great many cases. The operator should be given a reasonable time within which to prove the productivity of the oil sands he has found and while he uses due diligence and efficient skill in attempting in good faith to produce oil from those sands he should not be subject to the penalty of forfeiture of his lease and the loss of his investment because he did not shut off and proceed to deepen his well to the maximum depth specified in the lease before he could determine their productivity. No definition of drilling "with due diligence" should exclude a reasonable time within which to attempt to develop production from a discovered oil sand if the work is done promptly, skillfully, without undue delay and in good faith.

Here Mid State complied with these requirements insofar as the evidence shows and was unable to produce clean oil from the well until August 17, 1940. It should follow that the notice of June 18, 1940, was prematurely given and cannot support a forfeiture of the lease because it gave Mid State but two days before the start of the ninety days in which to start the second well in which to determine the productivity of the well. This cannot be held to be a reasonable time under the facts here.

Under date of August 15, 1940, Freeman E. Fairfield and Ruth Fairfield, his wife, C. R. Price & Company and Mid State Petroleum Company signed and acknowledged a quitclaim deed to Welport Oil Company releasing from the oil lease about 50 of the 60 acres of the leased property, thus reserving to Mid State about 10 acres around the one well. This was done under paragraph seven of the lease which gave the lessee the right to quitclaim any part of the leased property "after discovery of oil."

This deed was received by plaintiff on, or shortly after, October 1, 1940, and was recorded on October 12, 1940, after the notice of forfeiture had been served, so all that is really involved here is about 10 acres of the property originally leased by plaintiff to Fairfield.

540

Defendants maintain that by the acceptance of this deed plaintiff has recognized the validity of its original lease which it here seeks to have declared cancelled, has changed the positions of the parties and has waived the purported forfeiture if it ever had any effect. As the judgment must be reversed we need not explore this problem. In this connection plaintiff points out that certain overriding royalties were assigned to various persons who did not join in the quitclaim deed. They were joined as defendants here and have not appealed from the judgment against them so it is final as to them. The judgment is also final as to C. R. Price & Company and its trustee in bankruptcy. From the record before us it would appear that plaintiff has been successful in clearing its title to fifty of the sixty acres described in its lease to Fairfield.

In this connection attention should be directed to the concluding portion of the second paragraph of numbered paragraph 16 of the lease which provides that "on the abandonment of a portion of the premises . . . the Lessee may operate such wells as in its discretion shall deem sufficiently productive to operate." It would seem that an abandonment of the major portion of the leased premises has been effected.

On a subsequent trial consideration should be given to the question of the right of Mid State to retain and operate its one well with sufficient land to enable its operation as long as that well, in the discretion of Mid State, produces sufficient oil to pay to operate.

The trial court found that the well was not, at the time of trial on May 8, 1941, and never had been, a well producing oil in paying quantities. This finding, which might have been termed a conclusion of law, is based on the following facts found:

"It is true that after the defendant Mid State Petroleum Company went into possession of the aforesaid premises under its aforesaid lease, it expended as the cost of drilling of said well on said premises more than $11,000; and that thereafter it has expended in producing said well more than $1,000; and that hereinafter the reasonable cost of producing such well would exceed $1,000 per year. It is true that said well is now, and at all times has been, without value, and is not worth any part of said sum of $10,000, or any amount whatsoever."

There is no other particular fact found bearing on the question of the well having produced oil in paying quantities. The well had produced between 2,300 and 3,800 barrels of oil

between March 18, 1940, and the time of trial. The undisputed evidence is to the effect that the well went on steady production on August 17, 1940, and had to be cleaned but once after that date; that it produced and continued to produce between fifteen and twenty-five barrels of clean oil per day; that the market value of that oil was 65 cents a barrel at the time of trial; that the well was pumped in connection with eleven other neighboring wells so that the cost of operation was small.

If the well can produce fifteen barrels of oil per day per year, and if that oil could be sold for 65 cents per barrel, as the evidence indicates, there would be an annual return to the operating company of about $1,400 a year after deducting royalties and costs of production. It may be, and probably is, true that other expenses, such as taxes, should be deducted from this annual return before the net can be correctly determined. While the annual net return from the well will be small, we believe that this question should be further explored before the trial judge reaches the conclusion that the well will not produce oil in paying quantities in view of the fact that the lease leaves the determination of that question to the lessee and the evidence now in the record indicates that the oil produced would more than pay operating and production costs.

Plaintiff complains because it had been paid no royalty because none of the oil produced had been sold. We are not particularly concerned with this question here because failure to pay royalties was not specified as a breach of the lease upon which plaintiff relied in either of the notices served by it.

The portion of the judgment against appellants Freeman E. Fairfield, Ruth Fairfield and Mid State Petroleum Company is reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied May 25, 1942, and respondent's petition for a hearing by the Supreme Court was denied June 25, 1942.