[Civ. No. 5097.   Fourth Dist.   Dec. 15, 1955.]

ERNEST L. DANKER et al., Respondents, v. WILLIAM Y. LEE et al., Appellants.

Jesse Bach Porter for Appellants.

Roy J. Brown for Respondents.

GRIFFIN, J.—On March 26, 1952, plaintiffs and respondents entered into a conventional form of oil and gas lease of a 2-plus acre parcel of property with defendant and appellant William Y. Lee. The lease, by its terms, in paragraph 3

required lessee to "... start the drilling of a well for oil within 90 days from the date of this agreement, and to continue the work of drilling such well, after commencing the same with due diligence until a depth of 6,000 feet has been reached, unless oil is discovered in paying quantities at a lesser depth, or unless such formations are encountered at a lesser depth as will indicate to the geologist of the Lessee that further drilling would be unsuccessful."

Paragraph 19 thereof provides that "Upon the violation of any of the terms or conditions of this lease by the Lessee and failure to remedy the same within ninety (90) days (except as to commencement of operations for the drilling of the first well and as to the payment of royalties, in each of which cases the period shall be ten days) after written notice from Lessors so to do, then at the option of the Lessors this lease shall forthwith cease and terminate and all rights of said Lessee in and to said land shall be at an end."

By August of 1952, defendants drilled the well to a depth of 4,758 feet. At that depth the well having penetrated formations which appeared to the defendants to have been potentially producible, the defendants caused casing to be set and cemented in the hole and the well was equipped with pumping equipment preparatory to an attempt to produce oil from it. From that time until about the middle of January, 1953, the defendants worked sporadically on the well in an effort to seal off the entry of water into the bore hole. During the intervals in which remedial operations were not in process, attempts were made to produce the well by means of conventional pumping equipment. Although the well produced a considerable volume of fluid, the saleable oil extracted was practically nil. Only $7.94 was received by the defendants for oil sold during the month of October, $155.73 for oil sold in November, and nothing in December. The fluid from which the oil was extracted was hauled from the well by trucks. The cost of hauling alone was in excess of the value of the oil by $92.25 in October, $118.85 in November, and $37.63 in December. In addition to the moneys received from salvaged oil, as set forth above, the defendants also received a credit of $40 for oil salvaged by a vacuum truck firm, which had been engaged by the defendants to remove waste mud and oil. The above figures represent all of the moneys received from the oil produced from the well.

About the 1st of February, 1953, the engine of the pumping unit, which had previously broken down on several occasions,

finally was not repaired and was hauled away. Efforts to produce the well were not resumed after this breakdown except for some effort to seek another engine and to make certain tests, and the well stood idle from that time until the date of the trial on March 31, 1954.

On April 17, 1953, plaintiffs served upon the lessee a written notice of default reciting:

". . . that you are in default in the performance of the terms and conditions of the Oil and Gas Lease executed by the undersigned, as lessors, and yourself, as lessee, . . . Your default, among other things, consists of the following: . . .

"2. You have failed to continue, as required in paragraph 3 of said Oil and Gas Lease, the drilling of the well heretofore commenced on the leased premises until said well should be drilled to a depth of 6,000 feet (oil in paying quantities not having been discovered in the drilling of said well to its present depth).

"3. You have suspended, and continue to suspend, drilling and producing operations on the leased premises, although no good cause therefor exists, as defined in paragraph 7 of said Oil and Gas Lease. . . .

"You Will Please Take Further Notice that the undersigned hereby demand: . . .

"2. That within ninety days from the receipt by you hereof, you recommence operations for the drilling of a well on said leased premises for the production of oil and/or gas therefrom, and that you thereafter diligently prosecute said operation until a well is drilled to a depth of 6,000 feet or oil in paying quantities is discovered at a lesser depth.

"The Undersigned Hereby Elect, unless you comply with each of their demands as above set forth, to forfeit said Oil and Gas Lease and all of your right, title, and interest in and to said leased premises thereunder.

"Dated this 8th day of April, 1953.

(Signed) Ernest L. Danker
Gertrude Danker."

Apparently the defendants did nothing about the well or on the lease following the service of said notice, except to occasionally check to see if gas was present in the casing, and in one instance to have a test made to determine the level of the fluid in the well hole. On August 27, 1953, plaintiffs filed this action to quiet title.

The complaint alleged, in addition to other claims, that

under the terms of the lease, defendants agreed that within 30 days after the termination of the lease, they would remove all rigs and machinery, "and so far as possible to fill all sump holes and other excavations" etc. The prayer of the complaint was that plaintiffs' title be quieted, for damages, and that an injunction issue against defendants from entering upon said lands for any purpose.

Plaintiffs secured an ex parte order, without the requirement of bond, restraining defendants from so entering upon said lands for any purpose, during the pendency of the action and requiring them to appear and show cause why an injunction should not issue accordingly.

By their separate answers, defendants denied generally the allegations of the complaint and alleged that they did commence drilling, and drilled, as alleged, to a depth of 4,758 feet, but that there was sufficient indication of oil in paying quantities discovered at that depth; that no other lessees of wells in that immediate vicinity discovered, below that depth, any oil before or since this well was drilled; that from time to time defendants continued to improve the well and that they expended over $80,000 thereon; that defendants did everything possible to be done to produce a paying well in an unimproved area and that there are and were possibilities of increasing production but that defendants were precluded by the restraining order.

The trial court found generally that defendants breached the lease as set forth in the default notice, as indicated in paragraphs 2 and 3 thereof; that by the terms of the lease defendants agreed to properly fill all sump holes and neglected to do so within the prescribed time after the termination of the lease by virtue of the notice of default above mentioned, and in addition to quieting plaintiffs' title, allowed $1,300 damages.

There is very little conflict in the evidence. It is conceded that no drilling was done beyond the depth indicated, and no oil in paying quantities was actually produced. It is defendants' position that at that point they believed the oil sands encountered were potentially capable of yielding oil in paying quantities; that they unfortunately encountered water conditions at that strata and they believed that if the water was taken out the oil would pay; that accordingly they should have had a reasonable time within which to prove the productivity of the oil sands they found; and that this conclusion is fortified by the fact that other lessees of neighbor-

ing wells discovered oil at that depth in paying quantities. They cite such cases as *Welport Oil Co.* v. *Fairfield,* 51 Cal. App.2d 533 [125 P.2d 97]; and *Winship* v. *Wilkes,* 121 Cal. App. 44 [8 P.2d 502].

It is plaintiffs' contention that these neighboring wells have been completed since defendant started drilling, and were producing; that they were draining oil from plaintiffs' property; and that accordingly, by the default of defendants in not drilling to a greater depth or by suspending operations and so continuing to suspend producing operations, where no good cause therefor existed, the lease was breached under paragraph 7 thereof, which provides that:

"Drilling and/or producing operations may be suspended or curtailed on said property only in the event that they are prevented by the elements, accidents, . . . or other causes beyond the reasonable control of lessee. . . ."

Plaintiffs' evidence shows that after the removal of the engine for repairs on February 6, 1953, no operations of any moment were conducted on the premises; that on April 17th the well had stood idle almost two and one-half months; and that following service of notice of default over four months had elapsed before the complaint was filed, and no attempt was made to remedy the breach.

The court justifiably found that defendants did suspend work on the well more than 30 days prior to the service of the notice of default and failed to diligently resume operations of any nature on the lease after the service of said notice; that they did not diligently prosecute said operations to a depth of 6,000 feet or until oil in paying quantities was discovered at a lesser depth; and that by virtue thereof said gas and oil lease terminated. (*Louis Richardson Ranch, Inc.* v. *Gibson,* 40 Cal.App.2d 520 [105 P.2d 143].)

In paragraph 14 of the lease it is provided that "The term 'paying quantities' wherever used herein is hereby defined as the output from a well or wells of such quantity of one or more of the products authorized to be produced under this lease as Lessee may, considering the depth of well and quality of product and after a production test of thirty (30) consecutive days, deem sufficient to warrant further operations for its removal." A lease containing different provisions was under consideration in the Winship case, *supra,* which is relied upon by defendants.

It is next argued that the notice of default was insufficient,

premature, ambiguous and uncertain. Insofar as it related to the claimed breach indicated, no such complaint is sustainable. ▮ Such a notice is adequate if it points out to the lessee the particulars in which he is in default and requires him to remedy the same within the time prescribed. (*Jameson* v. *Chanslor-Canfield Midway Oil Co.*, 176 Cal. 1 [167 P. 369]; *Taylor* v. *Hamilton*, 194 Cal. 768 [230 P. 656].)

▮ We do not believe the issuance of the order of injunction, even though it may have been wrongfully obtained without giving bond, contrary to the provisions of section 529 of the Code of Civil Procedure, prejudiced defendants or was the cause of defendants' violating any of the provisions of the lease. It was not obtained until after the lease was terminated by the failure of the defendants to conform within the 90-day period. Any offer or attempt to conform after that time would not excuse performance. By the decree and in conformity with the lease agreement, the court permitted defendants to remove their surface oil well equipment upon certain conditions and within 30 days after service of notice of entry of judgment.

▮ A closer question arises in respect to the judgment of $1,300 awarded plaintiffs by way of damages for failure of the defendants to properly fill the sump in question. It was provided in the lease that upon the termination thereof lessee "shall, so far as possible, fill all sump holes—leaving surface of ground, so far as possible, in original condition, free from surface oil and debris." From the evidence it appears that defendants did fill the sump hole which was 15 feet deep by 18 feet wide and 60 feet long, but failed to remove the oil scum and debris, and as a consequence it ran over and upon other land of plaintiffs and made that portion of plaintiffs' property unfit for agricultural purposes and growing orange trees such as occupied the remaining property of plaintiffs. Estimates were made as to the cost of removing the dirt and oil scum, etc., and replacing it with good soil, and it was estimated at $1,300, the amount allowed plaintiffs in their judgment. Apparently the dirt in and the ground over the sump were not in their original condition after defendants filled the sump. It cannot be said that the finding is lacking in evidentiary support.

Lastly, it is contended that paragraph 20 of the lease precludes the forfeiture of it under the facts established. It provides:

"Notwithstanding any forfeiture of this lease, the Lessee

shall have the right to retain any and all wells being drilled, or producing or capable of producing oil or gas in paying quantities, at the time of such forfeiture. . . ."

This is the usual provision of such leases where there is a forfeiture as to a portion of the lease, which provision gives the right to the lessee to retain such wells as are then being drilled in conformity with the lease, that are then producing, or are in fact capable of producing oil or gas in paying quantities at the time of such forfeiture. Under the evidence and findings of the court defendants would not come within this reservation.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.