Woodrow **MAY** and Glyda May, husband and wife, George Locke and Dorothy Locke, husband and wife, and Violet Blodgett and Vern Blodgett, wife and husband, Appellants (Plaintiffs below),

v.

Paul **SHIELDS**, Don Shields, Marlin Vaughn and Mamie Vaughn, husband and wife, and Wyoming White Marble and Minerals Corporation, a Wyoming corporation, Appellees (Defendants below).

No. 3205.

Supreme Court of Wyoming.

June 24, 1964.

William Jones, of Jones & Jones, Wheatland, for appellant.

M. R. Foe and D. N. Sherard, Wheatland, for appellees.

Before PARKER, C. J., and HARNSBERGER and McINTYRE, JJ.

Mr. Justice McINTYRE delivered the opinion of the court.

The appellants as landowners seek to reverse a judgment of the district court under which their claim for ejectment in connec-

tion with certain mining property was denied.

The landowners admit the giving of a mineral lease to defendant-appellees for the production of marble. The primary term of the lease was five years. After about half of this term had run, the lessors served notice upon the lessees of default and termination of the lease. The notice gave the lessees 60 days within which to correct the asserted defaults. Following such 60 days the action in ejectment was commenced.

The lessors contend the lessees are guilty of four separate defaults which have caused the lease to terminate. The defaults claimed are these:

1. Failure to keep accurate and complete records.

2. Failure to keep the premises safe as to persons and livestock.

3. Failure to obtain coverage under Workmen's Compensation law and hazard insurance.

4. Failure to operate the premises in a good and workmanlike manner according to the standards and customs of the mining industry.

According to the lease agreement entered into by the parties, (1) lessees agreed to keep accurate and complete records of all minerals sold and the prices paid therefor; (2) they agreed, during the operation of the lease, to keep the premises safe both as to persons and livestock and to respond in damages for their negligence thereby; (3) they also agreed, during the operation of the lease, to furnish Workmen's Compensation and suitable hazard insurance and to save the lessors harmless from any damages through the operation of the lease; and (4) they further agreed to carry on the mining operations in a good and workmanlike manner according to the standards and customs of the mining industry.

The lease contains a provision for minimum royalty, which obligates the lessees to pay lessors a minimum royalty of $1,000 per year. In connection with this obligation there is a specific provision which recites that in the event such minimum royalty is not paid when due, then the lease shall terminate as of that date.

It is to be noted, however, that minimum-royalty payments were not in default, and there is no provision for an automatic termination in connection with any one of the four defaults claimed by lessors. There is a general provision on default, in paragraph 10 of the lease, which specifies that in the event of default by either party in the performance of any of the covenants, if such default shall continue for a period of 60 days after written notice of such default is given by one to the other (such notice setting out the particulars of such default and making demand upon the other to make good the alleged default), then it shall be lawful for the party giving the notice to terminate and end the agreement.

If we understand the position of appellants correctly, they recognize that except for the general default provisions contained in paragraph 10 their proper remedy for any of the alleged violations would be an action in damages rather than a termination of the lease. See Vaughan v. Napier, 92 W.Va. 217, 114 S.E. 526, 528; Sewell v. Aggregate Supply Company, 214 Ga. 543, 106 S.E.2d 16, 18; Keller v. Model Coal Company, 142 W.Va. 597, 97 S.E.2d 337, 340; and Mauney v. Millar, 134 Ark. 15, 203 S.W. 10, 12.

We turn therefore to a consideration of the circumstances under which lessors can declare a termination of the lease for defaults alleged pursuant to the provisions of paragraph 10. In that regard we notice appellant-lessors are taking the position that the alleged defaults pertaining to the keeping of records and operating of the premises are incapable of correction within the 60-day notice period, since they affect conduct already transpired and incapable of reenactment.

We think termination of the lease under paragraph 10 cannot be construed as a substitute for the remedy of an action to recover damages, where a violation of covenant is claimed that cannot be corrected. It is clear from the language employed

in paragraph 10 that the party notifying the other of a default must set out the particulars of such default and make demand upon the other party to make good the alleged default.

The only reasonable interpretation of such a provision is that it operates only when the particulars of the alleged default are set out as required and when there is an opportunity for the party notified to make good any existing default called to his attention. See Kirker v. Shell Oil Co., 104 Cal.App.2d 497, 231 P.2d 905, 910; Hoover v. General Crude Oil Co., 147 Tex. 89, 212 S.W.2d 140, 142–143; Neff v. Jones, Okl., 288 P.2d 712, 716; Danker v. Lee, 137 Cal. App.2d 797, 291 P.2d 73, 76; and Hermon Hanson Oil Syndicate v. Bentz, 77 N.Dak. 20, 40 N.W.2d 304, 308–309.

In order to deal with all the defaults claimed by the lessors, we deem it necessary to discuss each of them separately.

### Records

■ The obvious purpose of the provision for keeping accurate and complete records of all minerals sold and the prices paid therefor is to assure to lessors the full payment of all royalties. It appears, however, that the minimum royalty paid in this case exceeded and took the place of royalties payable from minerals sold. Appellants do not claim otherwise.

There is no provision for the furnishing of records by lessees to lessors, but the lessees are to keep such records. Lessors, according to the lease, are to have free access to all records as may be "sufficient to ascertain the correctness of the computations of the royalties."

Actually, there is no dispute as to the computations of royalty. In fact there is substantial evidence that George Locke, one of the lessor-appellants, worked for operators of the mine and acknowledged that he knew there was not enough ore being shipped for the royalty thereon to come anywhere near the minimum royalty, and as far as he was concerned there was no need for monthly statements.

Moreover, it is undisputed that, after the lessees received the notice of default from lessors, an answer thereto was served within 60 days upon lessors stating that accurate and complete records of all minerals sold and the prices paid therefor are available at the office of D. N. Sherard, attorney at law, in Wheatland. Attached to the answer was a list showing dates of sale of marble, weights shipped and sold and the price paid therefor.

Although appellants criticize the records presented by the lessees and point to the fact that certain inaccuracies were admitted, they fail to show any prejudice therefrom and frankly admit that all royalties payable had been paid through the payment of minimum royalties.

From this evidence, the district court could reasonably conclude that records had been kept "sufficient to ascertain the correctness of the computations of the royalties," as required by the lease; or if any default in that regard existed originally, that it was adequately remedied within 60 days after notice of default.

### Keeping Premises Safe

The agreement of the lessees regarding safe premises was that they would "keep the premises safe both as to persons and livestock and shall respond in damages for their negligence thereby." There was no showing that damages had resulted nor that lessees had failed to respond in damages for negligence in keeping the premises safe.

However, without attempting to say whether lessors should be restricted to an action for damages before attempting to terminate the lease for an alleged violation of this provision, we think it can be said the attempted forfeiture was not effective in any event.

■ It was not effective because the notice of default failed to set out, as required by the lease agreement, any particulars of an alleged default concerning safe premises, except an alleged failure to fence excavations. If there was a failure in that regard, ample evidence was offered at the trial tend-

ing to show the excavations were fenced within the 60 days allowed for correction, and that such fencing was adequate.

■ The notice of default specified a failure "to keep the premises safe both as to persons and livestock and to fence the excavations made by operations so as to prevent damage to livestock of the undersigned." Thus, the only particulars set out in the notice related to fencing, and the court was justified in finding the lack of fencing, if any, sufficiently corrected within the time allowed therefor.

Appellants seem not to make any contentions against the timeliness or sufficiency of fencing but argue instead that an unsafe condition was allowed to exist at one of the excavations by reason of a large mass of overhanging rock.

Not only does our view of the record convince us that the evidence was in conflict as to whether an unsafe condition existed on account of overhanging rock, but our view of the notice of default is that it did not set out the particulars of such a claim as an alleged default. Therefore, any question as to whether the overhanging rock caused an unsafe condition is not within the issues of this case.

*Workmen's Compensation and Insurance*

■ The provisions of the lease with respect to Workmen's Compensation and insurance are to the effect that "during the operation of the lease," lessees agree to furnish Workmen's Compensation and "suitable" hazard insurance against all losses for injuries to persons or properties. The only default claimed in this connection, in the notice of default, was a general claim of failure to furnish Workmen's Compensation and suitable hazard insurance against all losses for injuries to persons or properties.

During the 60 days allowed for correction of defaults, the evidence discloses, lessees notified lessors by their answer to notice of default that the present operator of the premises had two insurance policies

in force and that such operator was covered by Workmen's Compensation. The amount of insurance coverage, the type of coverage, number of policies and names of the insurance companies were set out. The lessors were also advised the policies could be examined at the office of attorney Sherard.

Although the policies were so examined, there is no evidence to indicate the lessors demanded additional or further insurance, prior to the bringing of their ejectment action. The contention now made is that Workmen's Compensation was not had by all lessees at all periods of the lease, and that the insurance policies contained an exclusion as to property damage resulting from blasting or explosion.

In view of the default provisions of the lease, as set forth in paragraph 10 referred to above, we are concerned only with the question as to whether a default existed at the time of notice, the particulars of which were set out in the notice of default and which default remained uncorrected for 60 days after such notice. Also, inasmuch as the provisions relating to Workmen's Compensation and insurance apply only "during the operation of the lease," we are concerned only with the lack of compensation coverage and insurance coverage on the part of the operator who was operating at the time of notice of default.

We need not concern ourselves with past operations. They could not be corrected and there was no demand for their correction. Neither do we need to concern ourselves with defaults which may have occurred subsequent to the notice and correction period. The particulars of defaults cannot be set out before they happen, and therefore defaults, if any, occurring subsequent to a notice of default must necessarily be dealt with in a new or additional notice before a lease could be terminated for such subsequent defaults.

Confining ourselves then to the question as to whether the operator who was operating the mining property at the time of notice of default either had compensation coverage and insurance coverage at the time

of notice or acquired coverage within 60 days after such notice, we find the evidence undisputed that such operator had both coverages before the end of 60 days.

Concerning the claim that the insurance policies contained an exclusion as to property damage resulting from blasting or explosion, we find nothing in the evidence to show that lessors, prior to their attempted termination of lease, objected to the extent of coverage and afforded lessees an opportunity to meet such objection. Moreover, no evidence was offered tending to show that operations on the lease were such as to endanger any property by blasting or explosion, or to show that lessors were adversely affected by such exclusion in the insurance.

■ Therefore, in the absence of a showing of prejudice on the part of lessors, we think the trial court was justified in following the equitable principle that forfeitures are not favored and a reasonable time for performance of a deficiency objected to must be granted before a forfeiture will be declared. North American Uranium, Inc., v. Johnston, 77 Wyo. 332, 316 P.2d 325, 331; Baker v. Jones, 69 Wyo. 314, 240 P.2d 1165, 1171 and 1172; Parkinson v. Roberts, 78 Wyo. 478, 329 P.2d 823, 827; Larsen v. Sjogren, 67 Wyo. 447, 226 P.2d 177, 182.

### Workmanlike Operations

According to the provisions of the lease, the lessees agreed to carry on "the mining operations" in a good and workmanlike manner according to the standards and customs of the mining industry. The question arises as to what mining operations are here referred to, and the only plausible answer is that the provision applies to such mining operations as are in fact carried on by lessees.

■ There is no express provision for a fixed volume or minimum volume of operations. On the other hand, there is a provision for payment of a minimum-annual royalty. Ordinarily such a provision is considered to supersede and take the place of an implied covenant for a reasonable amount of production, so that no particular amount of production is required during the primary term of a mining lease which calls for payment of a stipulated minimum royalty. Vitro Minerals Corporation v. Shoni Uranium Corporation, Wyo., 386 P.2d 938, 942–943; Frierson v. International Agricultural Corporation, 24 Tenn.App. 616, 148 S.W.2d 27, 37–38; Niles Land Co. v. Chemung Iron Co., 8 Cir., 234 F. 294, 299; Continental Fuel Co. v. Haden, 182 Ky. 8, 206 S.W. 8, 10; Sewell v. Aggregate Supply Company, 214 Ga. 543, 106 S.E.2d 16, 18. See also 58 C.J.S. Mines and Minerals, § 183, p. 390.

■ The notice of default did not particularize a failure to mine any designated volume of ore, neither did it cover deficiencies in operation subsequent to the giving of such notice. The lease cannot therefore be terminated for a failure to produce more ore, nor on account of a lack of operations after notice of default. Other shortcomings are not claimed, except that such mining as was done was not done properly.

■ As to whether the mining operations actually done by lessees were carried on in a good and workmanlike manner, the evidence was in conflict. Two expert witnesses characterized the operations as being in a good and workmanlike manner according to the customs and standards of the mining industry. We will not in the face of a genuine conflict in the evidence substitute our judgment for that of the trial court on this issue.

Our discussion has been specific rather than general, and we have dealt separately with each of the defaults claimed by appellant-lessors. For the reasons stated we conclude the district court was warranted in finding that no particulars of any default were stated in the notice of default and proved at the trial, which would justify a termination of lessees' lease. The judgment should accordingly be affirmed.

Affirmed.

GRAY, J., not participating.